The first case on our calendar is Watley v. Keller, and we have attorney Dan Barrett on behalf of the appellant. Good morning, counsel. Good morning, Your Honor, and good morning to the court. Along with my co-counsel Ilana Bildner, I represent the appellants, Joseph Watley and Karen Hasman in this matter, which is back to you for the second time on a pre-discovery 12B6 dismissal decision from the District of Connecticut. Can you speak up? I'm having a hard time hearing you. Yes, Your Honor. Can you hear me now? Yes, much better. Thank you. Great. Thank you, Your Honor. So, as I say, this case is back to the court for the second time in seven years on a pre-discovery 12B6 decision, and it poses the question of whether parents who have disabilities or are perceived as disabilities may enforce the ADA or the Rehab Act in the national court system when they've been prevented from doing so in the state courts. And since the District of Connecticut's dismissal decision rested in part on jurisdiction, perhaps I might start there. This case is not a Rucker-Feldman case for two very important reasons. The first is that the injuries that the plaintiffs complain of were not generated by the state court judgment that the defendants point to. In fact, the injuries that the plaintiffs complain of arose beginning in 2005 and 2006 in the out-of-court services provided by the defendants during the TPR and termination of parental rights and neglect litigation. So when you talk about their injuries, they're not taking their children back. Isn't that correct? That's absolutely correct, Your Honor. There's no request and no illusion that any action in the national courts could restore their children to them. They do not seek to displace that judgment of the superior court. Well, Mr. Barrett, what are the damages that they seek? Do those damages not include the pain and emotional suffering from losing their children? Your Honor, the damages, because the injury they complain of is the failure to be given the access and opportunity to the rehabilitation or reunification services, the damages would be limited to what a jury determined it was worth for them to be cut off from those services. Well, but, I mean, that doesn't quite answer my question. These folks, as far as I can tell, and you can correct me if I'm wrong, were not seeking out services. It's not like they went to a welfare agency and said, please give us some help with parenting. They were being required to engage in those services as a condition of not losing their parental rights. Yes? That's right, Your Honor. So what, you know, is one of the items of the suffering and pain that stems from not getting the services the loss of the children that results or not? No, Your Honor. I think in the context of this case, that is fairly off the table because the injury is simply the access and the opportunity to use the services. But then that brings me back to my other question. Are we talking about basically nominal damages or because, again, or the insult, the dignitary harm of not having the right sort of reunification services for its own sake and in and of itself? That's the key damage item here. Yes, that's correct, Your Honor. And this court has passed upon those many times in the past. For example, Bartlett versus New York Court of Law examiners, the dignity harm for not having an accommodation on the bar exam. Loughlin versus Staten Island University Hospital, the the same harm for failing to have been provided with an ASL interpreter. Could you give me? I'm sorry. Go ahead. My conceptual problem is I have a great deal of difficulty even conceiving what you believe the accommodation in this context would be. You have a two, you know, two and then later one dysfunctional parents. You have a state whose obligation is to protect these newborns from ostensibly incompetent parents. And the whole process was trying to deal with their disabilities. Counseling service, medication, working with them when they when they would miss appointments and weren't taking their medication and so forth and so on. What is it that was supposed to have been going on that would be, in your view, would look like an accommodation? Well, you know, we never got that far in the District of Connecticut. But to give you two very quick examples of Ms. Hasman, for example, was diagnosed with multiple times of severe narcolepsy. And she was nonetheless. And if you look at page 172 in the joint appendix, she was dropped from counseling for sleeping through the sessions, which is a direct. You know, it's a symptom of the very disability the state contends her to have. So so then you you foresee a federal court superintending and micromanaging this process, which is not the kind of thing we usually do that. You know, she she should have been able to miss three sessions rather than two. And she should have had psychotherapy five days a month rather than four. Well, Your Honor, to be fair, the national court system looks at assesses ADA accommodation disputes all the time. So a range of not like this, it doesn't. Your Honor, these services, the rehabilitation and reunification services, we are looking at the out of court action. So it is simply a program and service provided by, in this case, the state of Connecticut. And it can be assessed just as with any other ADA dispute. Could I address that, Mr. Barrett? I think I understand your point that the there's no collateral estoppel with respect to the legal issue of did these people did this DCF violate the plaintiff's ADA rights as such. But in terms and maybe that means the court has to do more thinking about this. But in terms of the facts, in terms of the facts, you're saying they did not deal adequately, for example, with the mother's narcolepsy. Isn't that fact something that they were able to raise in the state proceedings? Because doesn't that fact go to the question of whether the DCF did adequate efforts to reunite the family? Your Honor, in fact, some of these factual issues were raised in the state proceeding. But if you look at the very, you know, the middle appellate court decision reversing the second state court trial, the Connecticut Supreme Court was absolutely clear that there is only one way to raise these issues of noncompliance. Well, wait, wait, wait, wait. No, no, no, no, no. Not issues of noncompliance. The fact that is with respect to the narcolepsy issue. What is the difference between the fact that would underlie an ADA claim of failure to accommodate and the fact that would demonstrate inadequacy of the state efforts to unify? In other words, if the court made a finding that the DCF made adequate efforts to take into account the narcolepsy and other disabilities in connection with the reunification efforts, is that fact something that you would be able to relitigate in the ADA case? Your Honor, my time is up. May I continue to answer your question? Go ahead. Thank you. So, Your Honor, what is silent in the record is the relevant facts to an ADA analysis. So, for example, what accommodation Ms. Hasman and Mr. Wadley would have proposed in order to make the playing field level for them to access these services? Would they have to propose one? Or would the state be required to do that sua sponte? Well, Your Honor, this is the very catch-22 that the court is finding itself examining, which is that the parents could not propose that as an ADA accommodation because the Superior Court would not rule on that issue. It's forbidden from doing so. No, no, no, no, no, no, no. We're not talking about what happens in court. We're talking about what happens in the field, right? You're saying it's not about what happened in court. It's about what happened at the level of the provision of services in the first place. Were they required to propose an accommodation at that point? And if they were, did they? Well, Your Honor, you'll notice that that is not in the record in the decision relied upon by the defendants. But to answer your question, no, nothing prevents parents in the out-of-court services from demanding an accommodation or, indeed, for the state from offering one. And would anything have prevented the plaintiffs here from arguing in the state court that it was necessary for them to have these accommodations and they were denied and that undermined the requirement that the state make reasonable efforts to reunify, taking into account any disabilities? Yes, Your Honor. It would have been prevented for the reason that there are two distinct analyses. The ADA focuses on the access and opportunity to the services. The state law examination that the Superior Court is doing. I'm trying to make this very concrete. If I'm fighting to keep my children and one of the requirements that the state has to prove in order to take away my children is that they made adequate efforts to reunify the family, taking account of my disabilities in assessing what services needed to be provided, why can't I argue that in light of my disabilities, this particular thing was done badly and it should have been done differently and I should have gotten an accommodation? What is there that prevents that from being raised? I don't have to call it an ADA claim. Maybe there's no way to make a counterclaim that says, you know, you're trying to take my children. I'm filing a counterclaim that says you didn't comply with the ADA. You can't do that. I understand that. But what prevents you, if anything, from saying exactly what I just said? Because, Your Honor, the state courts construe the request for accommodation as raising the ADA issue. And that's exactly what the Connecticut Supreme Court did. You can't call it something else and pretend it's not an ADA claim. Well, I suppose you could, Your Honor, but the venue will construe it as raising a defense based on the ADA and tell you, as the courts did three times, that it's forbidden under Connecticut. Before judgment in the state court, why didn't you simply file a standalone ADA claim in federal court? That would have mooted all the Rooker-Feldman issues, wouldn't it? Well, it would have, Your Honor. The parents filed this action pro se. And so I don't have an answer as to why they didn't do that. But strictly in terms of Rooker-Feldman, the state court judgment did not cause their injuries. No state court judgment required the services to be provided in a way that violated federal law. So Rooker-Feldman here is, I think, not the main event. Their injuries were not caused by the state court judgment. And, of course, nothing that the District of Connecticut will eventually do will cause that decision to be reversed or to compel the defendants to take an action contrary to the state court judgment. But if it's not Rooker-Feldman, we still have to deal with the collateral estoppel possibilities. Was there ever an effort by the plaintiffs to say that the services were not provided in a way that took adequate account of our disabilities in order to constitute the kind of reunification efforts that the state requires? Yes, Your Honor. And that was at the second… And the state court said, no, that's wrong. The state court said that it's unclear what remedy is sought if, in this case, the mother was not attempting to assert the violations as a defense to the adjudication of neglect. That is to say, the state court was saying those concerns are not part of reasonable efforts. They are something separate and apart, and in accordance with state law, they are to be enforced in a separate lawsuit. I don't follow that at all. That's quite different than what you just quoted. Your paraphrase is quite different. The court says, unless it's to be interpreted as an ADA claim, it's not successful because it does what was done satisfied the state's obligation. And what I'm trying to get at is maybe you get to go with an ADA claim independent of Rooker-Feldman, but I'm still not clear as to what facts you could possibly allege that were not available to you in the termination proceedings as an argument that the state's obligations were not complied with. Well, Your Honor, it's less of a question of which facts were available to us than the question of whether the forum was available. You know, the law of issue preclusion requires that the issue be fully and fairly litigated. The parents here, by operation of state law, could not raise, for example, proposed accommodations and arguments about whether or not those accommodations were sufficient. That is far from clear to me. The hypotheticals I would mention, they were perfectly free to take issue with the medical services, the counseling services, and so forth and so on. You know, I didn't get the right medication. Give me some different medication. I didn't get enough or the right kind of counseling and on and on and on. All of those issues could have been raised in state court. Your Honor, I think the gap between the two is that the ADA is a different analysis. That is to say, what passes muster for reasonable efforts does not necessarily satisfy the ADA. And so all along the course of the litigation, it's entirely possible. And at points, they did raise a variety of problems related to the services, and the state court ultimately concluded that's no bar to reasonable efforts. The path you take us down with that analysis seems to me leads to the conclusion that the ADA litigation is going to completely supplant these state court adjudications, which are much better equipped to deal with people like your clients. Well, no, Your Honor. The state court adjudication simply determined at the end whether or not my clients would have the ability to continue as parents for their children. No, but you skip back between the end and the process. The process was an ongoing process that went on for years to try to get your clients the services they required in view. Well, with respect, Your Honor, I think the process was the services that were given to them. And the question was not – the ultimate question is not whether, given those services, they would have the legal right to parent their children. The ADA question here is, given the services that were offered, were those services tailored to their disability? Nothing about that. Well, what were they if they weren't tailored to the disability? Well, do you think they gave them the wrong kind of medication? Well, for example, Your Honor – Psychologists who weren't trained? What are you talking about? No, Your Honor. This would be the normal sort of access and opportunity measures that you would find in any run-of-the-mine ADA case. So, for example – You lost me there. I don't believe that. Well, Your Honor, the question with any ADA Title II claim is whether or not the service that was offered was tailored to the person's disability. They were given the meaningful opportunity to use the service. And so, in any ADA case, you are on some level going to be examined whether or not there was a modification that was appropriate. The defendant has the opportunity to say that it could not have provided it, et cetera, et cetera. That's, I think, routine for ADA litigation. The question here is, of the services that were offered, it's not whether under state law they were substantively the right services. It's whether, for example, when Ms. Hasman, who has a series of diagnoses that may lead you to believe that she has difficulty comprehending information, was failed at a parenting education because she had difficulty comprehending the concepts. That's an ADA claim. We'll have to wind up. Now you reserve two minutes for rebuttal. Let's hear from Connecticut. Counsel, good morning. Good morning, Your Honors. May it please the Court, my name is Jane Rosenberg. I'm representing the Connecticut Department of Children and Families, Commissioner Durantes, and former Commissioner Katz. The district court correctly dismissed this case, as I think Your Honors have recognized, because the plaintiffs want to litigate all of the issues that were previously litigated in state court. But the argument is that they weren't litigated because they couldn't raise their ADA claims in the termination proceedings. The ADA, what they call the ADA claims and the termination proceeding both involve the identical issue, which is whether DCF accommodated the plaintiff's disabilities in providing their services. And the standards under the two, under the ADA and the state termination statute, are the same. In both cases, the parent's mental disability must be taken into account. And it's a fact-specific, case-by-case analysis that looks at the effectiveness of the particular accommodation modification that's being offered. And also, in the case of the ADA, considers the cost. In this case, the state court conducted extensive proceedings that culminated in a 193-page opinion, in which the court concluded by clear and convincing evidence that DCF had made reasonable efforts to reunify the parents with their children and, in fact, had done everything possible to assess the parents' disabilities and address them. The court went on to note that it was, in fact, extraordinary, some of the efforts that DCF took. And I must say, with a 193-page opinion, there really was not an issue that was untouched here. If this court were to order an ADA case to go forward, it would effectively be relitigating every issue in this case. Now, the plaintiffs say that they couldn't raise their ADA claim. But as I said, under collateral estoppel, it's the same issue here. The issue is whether the parents' mental health, mental disabilities were accommodated. And that's precisely what the court was getting at. And, in fact, even in those instances when the plaintiffs did specifically say, we're raising this as an ADA claim, there was no prohibition, there was nothing jurisdictional, there was no bar in the state courts to raising an ADA claim. It's correct that the courts did say that the ADA is not a defense to a termination proceeding. But that does not mean that you cannot raise the accommodations and whether they were appropriate to accommodate the parents' mental health. And this was demonstrated well in the second termination trial, in which, in that case, the plaintiffs had counsel who did raise the ADA claims and raised it in the context of the ADA and said, we are not getting proper accommodations. And the court looked at the issue and said the attorneys presented evidence and made arguments, and the court concluded that there was insufficient evidence of any additional services that should have been provided and ultimately concluded that the ADA was not violated and the plaintiffs had not been discriminated against. Now, that decision was vacated, not on the merits, but because the underlying neglect decision was reversed on appeal. Which meant that the termination decision had to be vacated. But it's significant because it shows that there is not some inherent bar in the state court process that prevents someone from making these arguments that... Okay, Ms. Rosenberger, I think I understand that argument. I just want to be absolutely clear. You're not suggesting that the plaintiffs here are precluded by a factual finding that was made in the second trial, are you? Correct. Because the second trial was vacated, that has no preclusive effect. But I think the significance of it is it demonstrates that there is nothing inherent in the state court system that prevents plaintiff parents from making these arguments. In the other trials... But are we talking about making arguments or litigating claims? Well, we're specifically talking about... I mean, of course you could make ADA-like arguments there, I suppose. But how is that an adequate opportunity, really, to vindicate your ADA rights? Because the issue is the same. We're talking about issue preclusion and not claim preclusion here. And the identical issue is at the core of the ADA and the termination proceeding analysis. In both cases, you're specifically looking at the modifications and accommodations that were provided by DCF and whether those services accommodated the mental disabilities of the parents. Well, if that's so, Ms. Rosenberg, does that suggest that the district court needs to do a more granular analysis and that this may not be something that can be dealt with at the pleading stage? Wouldn't you have to look at exactly what the plaintiffs are alleging at a factual level? What facts are they saying happened or didn't happen? And then the question would be, is that particular factual allegation, claim, assertion precluded by the state court's judgment? I think both their individual facts and if the court wanted to, it could look at the fact-by-fact in the 193-page state decision. And I think the court would see that all of the issues that the plaintiffs are trying to raise in the federal court were exhaustively litigated in the state court. But in addition, the overall legal standard here is the same. So I don't think the court even needs to get into the factual questions because as a legal question, the parents' disabilities were accommodated here. As I read the plaintiffs' briefs, what they are suggesting is that the state's inquiry is whether taken as a whole, the state made adequate efforts to reunify so that the state, the DCF, was not precluded from establishing inadequacy of the parents. While I think they're suggesting that if on one occasion a parent needed a sign language interpreter and wasn't given one, maybe in the global assessment, that wasn't enough to defeat the DCF's obligation to make adequate efforts to reunify. But that in and of itself is a violation of the ADA. I think that's the plaintiff's position. And so they should be able to claim whatever damages in here in being refused that particular accommodation on that particular day. In the state court, Your Honor, part of the state court's or the end of the state court's 193-page opinion was, conclusion was that everything possible was done in this case for these plaintiffs. So I would argue that to go back and say, well, could have an additional narcolepsy evaluation been done or something like that? Effectively, the state court has addressed that question and said, this is exhaustive. We've done everything. And it is impressive the number of Ph.D. level evaluators and therapists that were put on this case and the years of efforts that were made to try to accommodate these parents. If the parents are trying to get their kids back, why does Ruckelselman apply? If they were trying to get their children back? If they're not, Mr. Barrett can see that that is not the object of any of this litigation any longer. So if that's the case and they're not litigating over the propriety of having been having lost parental rights, why does Ruckelselman apply? Because there was a series of orders, Your Honor, throughout the course of the proceedings. It was not just one order at the end of the proceeding that terminated the parental rights. But because termination proceedings involve the constitutional right of the parents to a parent-child relationship, the state courts treat many of the stages in the course of the termination process that would otherwise be considered interlocutory to be in fact final judgments. But Ruckelselman only looks to state court judgments. Isn't that right? Yes. And what I was saying was each of these orders is considered a final judgment. So things such as visitation orders are treated as final judgments that are appealable in the state court. And the same with the specific steps. I submitted supplemental authority on that to the court, the In re Justin F. case, in which the appellate court treated the challenge to the specific steps that were provided to the parents in DCF as an appealable final judgment. And the significance of that is that the specific steps lay out their court orders by the judge early on in the case at the order of temporary custody stage, in which the judge lays out specifically what DCF and the parents are expected to do in order to achieve reunification with the children. So to the extent the Ruckelselman would bar challenges to the specific steps, orders of particular evaluators, orders of particular visitation. Many of the issues that the plaintiffs have raised are in fact caused by specific orders within the specific steps or from the court itself. Now, I do concede it doesn't Ruckelselman does not get rid of the whole case. But the collateral estoppel clearly does because the issues here were all were all adjudicated. But in addition, Ruckelselman applies to court orders along along the process, such as visitations, specific steps. So do you concede that these two plaintiffs have standing to seek injunctive relief for the kind of procedure that they were put through? No, the district court correctly held that the plaintiffs have no standing here. They do not claim any present injury, but are claiming future injury if they should become engaged with DCF in the future. But that's purely if they have more children. As the court correctly concluded, it's far too speculative. Mrs. Houseman's in her 50s. She's no longer together with the father. It would be it would require a whole series, an extenuated series of of things that would have to happen in a chain of causation. So if the mother were able to adopt or to become pregnant in her 50s, and if she was with the same father and not somebody else, because the whole situation would be different if there might if perhaps there could be a different partner who might be very supportive. You'd have a different situation there if they then became acted inappropriately and their conduct came to the attention of DCF. And if DCF then conducted an investigation and decided to seek a court order to take custody. And if they decided to rely on predictive neglect at that point, and if the court granted the order, there's a whole causal, extenuated set of circumstances that would have to happen here before they would actually run in with DCF again. Suppose the appellants here had filed a standalone ADA claim, say, prior to to simplify this prior to a final judgment in state court. What would be the state's position on these cases theoretically moving along parallel tracks? I mean, could that occur? It could occur in the sense in this particular case. In fact, what happened was the appellants, the plaintiffs, went to our Connecticut Commission on Human Rights and Opportunities and filed a claim there in the course of the proceedings that were ongoing in the state court. And that commission looks at discrimination under state laws. It's discriminatory. State agencies such as DCF are prohibited from discriminating on the basis of disability, and they must take the ADA into account in providing services. That's all in state law, state statute. And so the plaintiffs went to the CHRO in 2008, right around the time of the first termination. They presented their claims. The CHRO rejected them, said they found no likelihood of discrimination here. And then they provided the plaintiffs with information on how to appeal that decision, which would have then gone to the state superior court as a parallel proceeding. The plaintiffs did not pursue that option, but that would have been open to them. They could have gone to federal court. I don't know what would have happened. There may have been some younger issues there, younger abstention problems. But there's nothing that I know of that would inherently exclude them. You see how opposing counsel makes the argument of catch 22. They claim they didn't get a full and complete opportunity to litigate, that the kids were taken away from them because of their disabilities and no accommodation was made. And now they come to federal court and we tell them, sorry, you had your chance. So just deal with that allegation. Yes, Your Honor, I totally disagree with the contention that it's a catch 22. Because as I've explained, the issue here is whether the DCF services were accommodating their disabilities. And that was precisely the issue that was litigated in the state court. So there was nothing preventing them from fully litigating that. They did have issues with their counsel. They kept having turnover because they would fire their counsel. And then they tried to, several times they tried to present these ADA claims by themselves, just pro se. Tried to raise issues with saying they wanted a particular coordinator at trial. But I think the problem there was they were presenting their issues, trying to present them on their own without the help of counsel. Well, whether they were given a coordinator at trial, I take it, is not an issue anymore. Am I right about that? Because that would be a Rooker-Feldman kind of issue, I thought. I thought the argument was that the plaintiffs are not raising anything about what happened in court, or any denial of any rights by the court. They're arguing denials of rights by DCF in the reunification phase of the case. Correct. That's my understanding, too. Is there any relevance? My understanding, and you can correct me if I'm wrong, is that the plaintiffs denied having disabilities during that process. Yes, part of the problem when they tried to raise their requests for accommodations under the ADA in state court was that each time they did so, they emphatically denied that they had any disability, which then caused the court to say, well, what should I be doing here if you aren't claiming any disability or offering no proof of incompetency? So, again, it was an issue with the way the plaintiffs were trying to present their arguments. Did this argument ever change, the I'm not disabled argument? Was that a position they maintained throughout the litigation? Yes, I believe they maintained it right from the very beginning. And then at the third and final termination trial, they were still maintaining that they had no disability because they raised the issue at the beginning of that trial. And Judge Keller questioned them and said, can you explain to me what the issue? At that point, they wanted someone in the trial to sit in the courtroom. And she questioned them and said, well, what is the disability? What do you need accommodated? And they said, we have no disabilities. So, yes, Your Honor, throughout, they took the same position that they were not disabled. This is a good point at which to conclude your argument, counsel. Mr. Barrett, you reserve two minutes for rebuttal. Thank you, counsel. Thank you. Thank you, Your Honor. What the court's questioning highlights is. The question is, explain to me what an ADA claim looks like on behalf of a plaintiff who denies being disabled. Your Honor, the ADA protects not just people with disabilities, but people who are regarded as having disabilities. Oh, sure, Mr. Barrett. That works if you are looking for a job and the employer says, you know, I think you're retarded. I'm not going to hire you. That's a perceived disability even if it isn't true and the job was denied on the basis of perceived disabilities. How do you accommodate a disability that does not exist? Your Honor, the question I think that, well, you have to examine under the ADA what you would do is say, first of all, do we have a person whose condition limits their daily life activities, right? This is what we see in every ADA case. That's absent from the superior court decision relied upon by the defendant. So I think the first step would be that even if the plaintiffs, for purposes of state court litigation, disclaimed a disability because you must remember that the petition for predictive neglect that was lodged against them identified these deficiencies as the reason why they should not be parents. Yes, but all these deficiencies were in their heads. It wasn't like, you know, they had difficulty walking or difficulty, you know, manipulating a computer or something like that. These were issues that were in their heads and were manifested by their behavior. And once you get, once their existence is denied like your clients do, what's some judge supposed to do? Well, Your Honor, the ADA protects mental illness and psychiatric conditions on the same basis. I know that. Yes, of course it does. But, you know, I don't recall, and, you know, I could be wrong, where an ADA plaintiff recovered under the act where that person denied being disabled. Well, Your Honor, perhaps that's the first element that the District of Connecticut should examine on demand. But as the questionings to opposing counsel, the questions raised is our fair shot at litigating the affirmative defense of issue preclusion. But your client isn't disabled. Your Honor, they very well may be. In addition, Mr. Wiley... They said they weren't. So what are we doing here? Your Honor, in count two of the amended complaint, Mr. Wiley has pleaded a complaint, So there's an additional level as to beyond what accommodation was due him, whether or not he was discriminated against, divorced from his status as having a disability. Can I raise a question? We haven't reached the statute of limitations issue. Could you identify for me what DCF failed to do after 2010? Yes, Your Honor. So it's the tailoring of the services. So in June 2011, the 2009 termination decision was reversed. That restarted DCF's state law obligation to provide reunification rehabilitative services to my clients. That also restarted the co-terminus ADA obligation, which was to tailor any service to their disability. Exactly. So what after June of 2011 did they fail to do? Because many of the things that you've cited so far seem to me to have taken place back in 2007 or thereabouts. So I want to know what is alleged in the complaint that happened after June 2011, that even assuming a continuing obligation that would bring up all the old things, or just as a standalone violation after 2011, what happened then that was a failure? Your Honor, it was a repeat of offering the same garden variety services that were not tailored in a manner to accommodate their disability. So effectively what the state proposed was, let's retry these things that we failed you out of again and again. And unsurprisingly, that does not satisfy the ADA. Well, wait, wait. What actually happened? They instituted some program and in that program there was a failure to accommodate? You see what I'm saying? It's the same program. But your whole point is that program needs to be tailored in particular. So what is the failure of tailoring that happened after 2011 that is visible on the face of the complaint? Well, Your Honor, as pleaded in the complaint, it was the methods of, the services that were offered and the methods of evaluation. And so you'll see in the Superior Court decision. That seems awfully conclusory. I'm trying to get at what actually is it. Before you said, well, there was a time when because Ms. Hussman was narcoleptic, she fell asleep and they held against her that she fell asleep. That's something that happened not in 2011, correct? That's right, Your Honor. So what do you have that's comparable in level of specificity after 2011? Service referrals, Your Honor, to the same programs and providers that had already been attempted. And those are defective for what particular reason? That doesn't accommodate their disability? Yes, Your Honor. So the state here, you know, can win state court by pointing to volume and duration. But of course, you know, as Judge Parker's question. Right, but you're the one who has to allege an ADA violation that takes place within the statute of limitations. So I'm trying to identify what exactly is it that is the accommodation that didn't happen or the failure or the exclusion of them from a service in that period. Right. Your Honor, it's the failure to provide a different range of services, these that were tailored to their disability. So I'm not sure how we work. What would that look like? I mean, I'm just trying to understand what exactly it is that is the failure here. Sure. So, Your Honor, if you were to ask me what kind of assistance might have been offered, for example, one-on-one coaching with someone who had dealt with the very disabilities that the state alleged my clients to have, for example, a parent aide who could be in the home and assist and teach how to parent, taking into account the disability. There are a range of accommodations that could have been made, but they weren't. They weren't even addressed. Well, were your clients disabled? For purposes of the ADA, yes, Your Honor. They had, and you'll see. Sorry, Your Honor. So, for example, Ms. Hasman's narcolepsy. There is a point in which the Superior Court concludes, and it uses this language, that it limited her daily life activities. That's the first element of the ADA right there. Well, this is a good time to conclude. Do you have a sentence in conclusion? I know we've used most of your time, counsel. Thank you, Your Honor. Your Honor, yes, for the reasons that our injuries are not caused by the state court judgment and for the reason that we need a fair shot to rebut the affirmative defenses, we ask that the court reverse and remand to the District of Connecticut. Thank you both for a very good argument.